## BOARD OF DIRECTORS OF ST. FRANCIS LEVEE DIST. v. ST. LOUIS–SAN FRANCISCO RY. CO.

## SAME v. MISSOURI PAC. R. CO.

## SAME v. CHICAGO, R. I. & P. RY. CO.
### Nos. 9838–9840.

Circuit Court of Appeals, Eighth Circuit.
Nov. 5, 1934.

Charles T. Coleman, of Little Rock, Ark. (J. L. Shaver, of Wynne, Ark., Richard B. McCulloch, of Marianna, Ark., and Walter G. Riddick, of Little Rock, Ark., on the brief), for appellant.

E. T. Miller, of St. Louis, Mo., and E. L. Westbrooke, Jr., and E. L. Westbrooke, both of Jonesboro, Ark., for appellee St. Louis-San Francisco Ry. Co.

C. E. Daggett, of Marianna, Ark. (Thomas B. Pryor, of Fort Smith, Ark., and H. G. Combs, of Little Rock, Ark., on the brief), for appellee Missouri Pac. R. Co.

Thomas S. Buzbee, of Little Rock, Ark., for appellee Chicago, R. I. & P. Ry. Co.

Before SANBORN and BOOTH, Circuit Judges, and MUNGER, District Judge.

BOOTH, Circuit Judge.

These three appeals are from one decree entered in six separate suits which were consolidated for trial.

Each of the three appellee railway companies had brought two separate suits against the appellant seeking to have held void the respective assessments of benefits made against its property within the confines of the St. Francis levee district of Arkansas for the years 1929 and 1930, respectively; also seeking an injunction against the attempted collection of any tax based upon said assessments.

Decree was entered granting the relief prayed.

Since the commencement of the litigation, the Chicago, Rock Island & Pacific Railway Company has paid the 1929 tax against its property. Its present attack, therefore, centers around the assessment of benefits and the tax for 1930.

The salient facts leading up to the decree are substantially as follows: The levee district was created in 1893 for the purpose of constructing and maintaining a levee on the west bank of the Mississippi river from the Missouri line on the north, where it joined a like levee in Missouri, to the mouth of the St. Francis river on the south, where it joined a like levee in Louisiana, a distance of 165 miles. The money for the construction of the levee was obtained by the issuance of long-time bonds. The assessments of benefits, and the tax levied thereon, were extremely low at the beginning, because the protection afforded by the incompleted levee was comparatively small, and tax money was only needed to pay interest on the bonds. The benefits and the tax were progressively increased during succeeding years.

The various statutes of Arkansas relating to the levee district are set out in the margin.[1]

---

[1] The levee district was created by Act 19 of the Acts of 1893 (pp. 24–26).

Section 1 defines the boundaries of the district, and provides for a board of directors to manage its affairs.

Section 2 provides:

"The Directors herein named and their successors in office shall constitute and are hereby declared to be a body politic and corporate by the name and style of the Board of Directors St. Francis Levee District, and by that name may sue and be sued, plead and be impleaded, and have perpetual succession for the purposes hereinafter designated."

Section 4 provides:

"The said Board of Levee Directors shall have power and it is hereby made their duty to levee the St. Francis front in this State and to protect and maintain the same in such effective condition as honest, able and energetic effort on their part may attain by building, rebuilding, repairing or raising levees on the right bank of the Mississippi river. * * *"

Act 22, approved June 5, 1897 (Ex. Sess., pp. 59, 64), authorized the issuance of bonds by the levee district to raise money for the construction of the levee. Section 6 of the Act is as follows:

"That to the payment of both the principal and interest of the bonds to be issued under the provisions of this act, the entire revenue of the district arising from any and all sources is by this act pledged, and the Board of Directors are hereby required to set aside annually from the first revenue collected from any source whatever a sufficient amount to secure and pay the interest on said bonds."

Section 1 of Act No. 61 of the Acts of 1903 (page 104) provides, among other things, as follows:

"* * * said board of directors shall have the power, either at a call meeting or at a regular annual meeting, to elect a land owner in said district from each county in said district, who shall compose a board of assessors for said levee district, and shall each for the county he represents make an assessment of all the lands, railroads and tramroads in his county, in books to be provided by the board for that purpose. The said lands shall be entered upon said books in convenient subdivisions, as surveyed by the United States government, in appropriate columns showing the names and residence of the owners of said lands, a description of said lands, showing the number of acres in cultivation and in woods as nearly as said assessor can ascertain without measurement, the value thereof as assessed without levee protection, and the value thereof as estimated increased by levee protection. That railroads, tramroads and right-of-ways, including road beds and appurtenances in said levee district shall be assessed according to the betterment and increase in value as the real estate hereinbefore referred to, and may be assessed per mile instead of per acre."

Section 2 of Act No. 61 (page 105) provides as follows:

"That said assessors shall make their

It is seen that under the provisions of these Statutes, the members of the board of assessors are elected by the board of directors of the levee district; that there is one assessor for each county in the levee district; that the board of assessors equalizes and corrects the assessments of benefits made by the several assessors; and that the board of directors of the levee district then levies the tax to be collected on the assessment of benefits so equalized and corrected.

It is to be further noted that by the provisions of the Statutes, each assessor for his own county assesses the benefits accruing from the levee to the various classes of property benefited, e. g., lands, town lots, railroads, tramroads, telegraph and telephone lines, etc.

Benefits are assessed on acreage lands per acre, on railroads per mile. The benefit is the difference in value of the unit with and without the levee.

When each assessor completes his assessment, he files it in the levee board office at its domicile. When the assessments of benefits are all filed, notice is published in each county calling on all persons aggrieved by the assessment to appear before the board of assessors at the time and place stated in the notice and present their grievances.

At the appointed time and place, the assessors from the several counties meet and organize themselves into a board of assessors and equalizers to correct individual assessments, if they are excessive, and to equalize the assessments throughout the levee district, so as to insure uniformity and prevent discrimination. This board of assessors and equalizers lowers assessments that are too high and raises those which are too low.

The Statute provides as to the meeting of the board of assessors and equalizers and as to the powers of said board in the following language:

"That after said notice shall have been given the assessors shall meet at the office or place of business of said board, on the day mentioned in said notice. They shall select a chairman and a secretary, and keep a record of their proceedings. They shall hear complaints of land, railroad and tramroad owners, and adjust any errors or wrongful assessments. They shall compare and equalize their assessments, and correct their books to conform to said equalization, and their assessments as equalized shall be the assessment of said levee district until the next

assessment in their respective counties at such time as they may be directed so to do by the board of directors of the St. Francis Levee District. After each of them has made the assessment they shall forward a report to the president of the board, and may indicate to him the day upon which they desire to meet for the purpose of equalizing said assessment. Thereupon the president of the board shall cause a notice to be published in each county, calling on all the land, railroad and tramroad owners or persons aggrieved by reason of the assessment to appear on the day named before the board of assessors, for the purpose of having any wrongful or erroneous assessment corrected. That after said notice shall have been given the assessors shall meet at the office or place of business of said board, on the day mentioned in said notice. They shall select a chairman and a secretary, and keep a record of their proceedings. They shall hear complaints of land, railroad and tramroad owners, and adjust any errors or wrongful assessments. They shall compare and equalize their assessments, and correct their books to conform to said equalization, and their assessments as equalized shall be the assessment of said levee district until the next assessment shall be ordered by the board of directors. Said assessors shall hold office during the pleasure of the board of directors of the St. Francis Levee District, and shall receive for their services such compensation as county assessors receive for similar services. In all meetings of said board of assessors a majority thereof shall be sufficient as a quorum for the transaction of business."

Section 4 of Act No. 272 of the Acts of 1917 (page 1451) provides, among other things, as follows:

"That for the purpose of building, rebuilding, repairing, and maintaining the levee aforesaid, and for carrying into effect the purposes and objects of this Act, the Board of Directors, St. Francis Levee District, shall have the power and it is hereby made their duty to assess and levy annually a tax upon the increased value or betterment estimated to accrue from the protection given against floods from the Mississippi river by said levee, and upon all lands, town lots, blocks, railroads and tramroads, telegraph and telephone lines, within said levee district, but that said levy and assessment shall not exceed eight per centum of the betterment, nor 25 cents per acre, and all town lots and parts of lots and blocks in said district shall be assessed according to the betterments and increase in value thereof."

assessment shall be ordered by the board of directors."

The tables of the equalized assessments of benefits for the years 1929 and 1930 are given in the margin.[2]

It is to be noted that there were very considerable increases in the assessment of benefits to lots and to telephone, telegraph, and power lines in 1930.

For purposes of convenience, the board of assessors classified railroads and tramroads. The railroads of appellees fell into several classes, the highest and most important being main line first class, on which the assessment of benefits was placed at $5,000 per mile.

It will be noted that by the Act No. 272 of the Acts of 1917 (page 1448), limits were placed upon the taxes that might be levied by the board of directors of the levee district upon the benefits or betterments fixed by the board of assessors. The tax could not be more than 8 per cent. of the betterment, nor more than 25 cents per acre.

There is no contention that the board of directors of the levee district has not kept within the limits named in the act of 1917; but the complaints of the railroad companies are directed: (1) At the classification of railroads made by the board of assessors; and (2) at the assessment of benefits by said board for the properties of the railroad companies.

From 1919 down to the present time, the benefits for main line first class railroads have been assessed at $5,000 per mile, and the tax has been 5 per cent. of the benefits, or $250 per mile.

---

[2] Exhibit No. 69 shows the equalization of assessment of property for levee taxes for the year 1929. It is as follows:

| Kind of Property | Grades of Property | Average Estimated Value Without | Average Estimated Value With | Average Betterment | Average Per Cent Increased Value |
|---|---|---|---|---|---|
| 1. Acreage | 13 | 20.14 | 23.10 | 2.96 | 14.7 |
| 2. Acreage | 7  20 | 34.06 | 39.06 | 5.00 | 14.7 |
| 3. Lots | 3 | 158.93 | 181.83 | 22.90 | 14.4 |
| 4. Vacant lots | 3 | 49.30 | 55.50 | 6.20 | 14.4 |
| 5. Vacant lots | 3 | 99.27 | 111.77 | 12.50 | 14.4 |
| 6. Imp. lots | 4  13 | 573.75 | 623.75 | 50.00 | 14.4 |
| 7. Main Line R. R. line— standard | 1 | 34,722.00 | 39,722.00 | 5,000.00 | 14.4 |
| 8. Side Lines Standard | 1 | 11,806.00 | 13,506.00 | 1,700.00 | 14.4 |
| 9. Main Line 2nd Class | 1 | 13,889.00 | 15,889.00 | 2,000.00 | 14.4 |
| 10. Side lines 2nd class | 1 | 6,944.00 | 7,944.00 | 1,000.00 | 14.4 |
| 11. Main line and branches— Other | 1 | 11,806.00 | 13,506.00 | 1,700.00 | 14.4 |
| 12. Tramroads Steel | 1 | 11,806.00 | 13,506.00 | 1,700.00 | 14.4 |
| 13. Tramroads Other | 1  7 | 3,472.00 | 3,972.00 | 500.00 | 14.4 |
| 14. Tel. Tel. & Power | 10  10 | 590.50 | 675.50 | 85.00 | 14.4 |

Total Kinds of property Assessed.............14

Total Grade of property Assessed.............50.

Exhibit No. 70 shows the equalization of assessments of property for levee taxes for the year 1930. It is as follows:

| Kind of Property | Grades of Property | Average Estimated Value Without | Average Estimated Value With | Average Betterment | Average Increase Value % |
|---|---|---|---|---|---|
| 1. Acreage | 13 | 20.14 | 23.10 | 2.96 | 14.7 |
| 2. Acreage | 7 | 34.06 | 39.06 | 5.00 | 14.7 |
| 3. Lots—Vacant | 9 | 122.37 | 136.84 | 14.47 | 14.4 |
| 4. Lots—Residence | 8 | 1,452.00 | 1,527.00 | 75.00 | 14.4 |
| 5. Lots—Business | 8 | 2,903.75 | 3,053.75 | 150.00 | 14.4 |
| 6. Lots—Manufacturing | 8 | 5,807.25 | 6,107.25 | 300.00 | 14.4 |
| 7. Lots—Utility | 8 | 11,614.62 | 12,214.62 | 600.00 | 14.4 |
| 8. Railroads—Main Line | 10 | 34,722.00 | 39,722.00 | 5,000.00 | 14.4 |
| 9. Side lines & 2nd track | 6 | 12,042.42 | 13,742.42 | 1,700.00 | 14.1 |
| 10. 2 & 3 Class Siding | 1 | 11,805.55 | 13,505.55 | 1,700.00 | 14.4 |
| 11. 4 & 5 Class Siding | 1 | 7,000.00 | 8,000.00 | 1,000.00 | 14.3 |
| 12. Branches & 2 to 5 Class | 8 | 17,218.75 | 19,643.75 | 2,425.00 | 14.1 |
| 13. Tramroads | 7–1 | 9,057.14 | 10,392.85 | 1,335.71 | 14.7 |
| 14. Tel. Tel. & Power | 11 | 923.63 | 1,058.22 | 134.59 | 14.5 |
| 15. All railroads | 15–6 | 18,750.13 | 21,450.13 | 2,700.00 | 14.4 |
| 16. All Tramroads | 3 | 7,986.00 | 9,136.00 | 1,150.00 | 14.4 |

Total kinds of property assessed...........16.

Total grades of property assessed...........123–7.

Up to 1929, these assessments of benefits have, so far as the record shows, gone unchallenged, and the taxes have been paid.

But in October, 1929, each of the three railroad companies filed in the United States District Court suit against the appellant alleging that the assessment of benefits was arbitrary and discriminatory; and asking that the assessment be set aside and that the collection of the tax be enjoined.

The meeting of the board of assessors and equalizers had been held July 23, 1929. Notice of the meeting had been duly published; but none of the railroad companies had filed any protest, made any appearance, or asked for any hearing.

The meeting of the board of assessors and equalizers met also in 1930 on June 19th, pursuant to notice duly published. The three railroad companies appeared by their attorneys, and protested orally against the assessments. The record is not clear as to just what was done by the railroads at this meeting. At one place it is stated that comparative figures were furnished; at another place, that the railroads asked leave to file written protests, which request was granted.

It is certain, however, that no formal hearing was had or asked for relative to the classification of railroads or relative to the assessment of benefits on their properties. Witness Banks, chairman of the board of assessors, testified that the railroads appeared, but furnished the board no information. They simply filed a protest.

At the trial in the District Court, the railroads did not show or attempt to show that at the 1930 meeting of the board of assessors any hearing was had, or even asked for.

However, in October, 1930, the three appellee railroads each filed in the United States District Court separate complaints, alleging that the assessments of benefits made by the board of assessors for the year 1930 were arbitrary, discriminatory, and violative of the Fourteenth Amendment.

It is noticeable that the complaints contain no allegation that a hearing was had before the board of assessors and equalizers, or that one was asked for. It is stated, however, that protests were made.

Upon this state of the record, appellant has raised several questions: (1) Did the Arkansas Statute provide an administrative remedy against wrongful assessments of benefits? (2) Was the administrative remedy (if one existed) exhausted by the railroad companies before resort was had to the courts? (3) If there was an administrative remedy, and it was not exhausted prior to resort being had to the courts, what was the effect of such failure?

The first and third questions may be taken up together.

■ The provisions of section 2 of Act No. 61 of the Acts of 1903 of Arkansas (page 105) have already been set out. Do they furnish an administrative remedy?

So far as we are advised, the Supreme Court of the state of Arkansas has not passed upon the precise question.

In the absence of such an adjudication by the Supreme Court of the state of Arkansas, we turn to other aids.

In the early case of Hodge v. Muscatine County, 196 U. S. 276, page 281, 25 S. Ct. 237, 240, 49 L. Ed. 477, the Supreme Court said:

"If the taxpayer be given an opportunity to test the validity of the tax at any time before it is made final, whether the proceedings for review take place before a board having a quasi judicial character, or before a tribunal provided by the state for the purpose of determining such questions, due process of law is not denied."

In First National Bank of Greeley v. Board of Com'rs of Weld County, 264 U. S. 450, page 454, 44 S. Ct. 385, 387, 68 L. Ed. 784, the Supreme Court used the following language:

"It is urged, further, that it would have been futile to seek a hearing before the state tax commission, because, first, no appeal to a judicial tribunal was provided in the event of a rejection of a taxpayer's complaint; and, second, because the time at the disposal of the commission for hearing individual complaints was inadequate. But, aside from the fact that such an appeal is not a matter of right but wholly dependent upon statute (2 Cooley on Taxation, [3d Ed.] p. 1393), we cannot assume that, if application had been made to the commission, proper relief would not have been accorded by that body, in view of its statutory authority to receive complaints and examine into all cases where it is alleged that property has been fraudulently, improperly, or unfairly assessed. Collins v. City of Keokuk, 118 Iowa, 30, 35, 91 N. W. 791. Nor will plaintiff be heard to say that there was not adequate time for a hearing, in the absence of any effort on its part to obtain one."

In Gorham Mfg. Co. v. State Tax Comm., 266 U. S. 265, page 269, 45 S. Ct. 80, 81,

69 L. Ed. 279, the Supreme Court used the following language:

"A taxpayer who does not exhaust the remedy provided before an administrative board to secure the correct assessment of a tax, cannot thereafter be heard by a judicial tribunal to assert its invalidity. Farncomb v. Denver, 252 U. S. 7, 10, 40 S. Ct. 271, 64 L. Ed. 424; Milheim v. Moffat Tunnel District, 262 U. S. 710, 723, 43 S. Ct. 694, 67 L. Ed. 1194; McGregor v. Hogan, 263 U. S. 234, 238, 44 S. Ct. 50, 68 L. Ed. 282; First Nat. Bank v. Weld County, 264 U. S. 450, 455, 44 S. Ct. 385, 68 L. Ed. 784."

In Utley v. City of St. Petersburg, 292 U. S. 106, page 109, 54 S. Ct. 593, 595, 78 L. Ed. 1155, involving a special assessment for a city improvement, the Supreme Court said:

"This court will not listen to an objection that the charge has been laid in an arbitrary manner when an administrative remedy for the correction of defects or inequalities has been given by the statute and ignored by the objector. Milheim v. Moffat Tunnel District, 262 U. S. 710, 723, 43 S. Ct. 694, 67 L. Ed. 1194; Farncomb v. Denver, 252 U. S. 7, 40 S. Ct. 271, 64 L. Ed. 424; Porter v. Investors' Syndicate, 286 U. S. 461, 52 S. Ct. 617, 76 L. Ed. 1226."

In United States v. Illinois Central R. Co., 291 U. S. 457, page 463, 54 S. Ct. 471, 474, 78 L. Ed. 909, involving an order of the Interstate Commerce Commission, the Supreme Court said:

"If the preliminary order be erroneous in any particular, it is susceptible of correction by the commission upon the hearing thus provided for. It will be time enough for appellees to seek the aid of a court of equity when they shall have fully availed themselves of this administrative remedy, and the commission shall have taken adverse action. Until then they are in no situation to invoke judicial action."

In the case of Kansas City Southern Ry. Co. v. Ogden Levee District, 15 F.(2d) 637, this court had occasion to examine the question of administrative remedies. In the course of its opinion, the court, speaking by the late Judge Kenyon, said (page 642 of 15 F.(2d):

"An administrative remedy is one not judicial, but one provided by a commission or board created by the legislative power. * * *

"The courts have frequently had before them questions involving the sufficiency of proceedings leading up to the assessment of general and special taxes. Through them all it is apparent that the courts consider that, where special assessments of benefits are made by boards or commissions under legislative authority as a basis for taxation to pay for special improvements, the taxpayer must have a right at some stage of the proceedings to a hearing, and that such hearing is not a mere matter of favor or grace with those entrusted with the assessment."

After reviewing the authorities up to that time, the court further said (page 641 of 15 F.(2d):

"In all of these leading cases, where judicial relief has been denied in tax assessment cases because of the party's failure to exhaust the remedies under state statutes, such remedies have provided for a hearing and the introduction of evidence and some kind of public notice."

To the same effect see Farncomb v. City and County of Denver, 252 U. S. 7, 40 S. Ct. 271, 64 L. Ed. 424; Milheim v. Moffat Tunnel Imp. Dist., 262 U. S. 710, 43 S. Ct. 694, 67 L. Ed. 1194; Robert Noble Estate v. Boise City (D. C.) 19 F.(2d) 927; Apartments Bldg. Co. v. Smiley, 32 F.(2d) 142 (C. C. A. 8).

In view of the foregoing authorities, we think it is clear that the Statute of Arkansas, above cited, did provide an administrative remedy; and that the railroad companies were required to exhaust that remedy before resorting to the courts.

As to the remaining question whether the railroad companies did exhaust the administrative remedy provided, so far as concerns the 1929 assessments of benefits and tax, there can be but one answer. There is no contention by the railroad companies that there was any hearing, request for a hearing, or even appearance by them.

As to the assessment of benefits and the tax for the year 1930, the case is somewhat different. At the meeting of the board of assessors and equalizers, the railroad companies did appear and did make oral protest.

We think, however, that this was not sufficient to constitute an exhaustion of remedy. There was no hearing and no request for a hearing, and the fact that the railroad companies asked leave to file written protests later would seem to indicate that no hearing was strongly desired.

It must be assumed that the administrative remedy provided for the appellee railroad companies by the Statutes of Arkansas was provided in good faith. The board of assessors and equalization was a quasi judicial body having exclusive jurisdiction of the assessment of benefits on account of the levee to the property in the levee district. The Statute required that that board should hear complaints and adjust errors or wrongful assessments.

The courts have held that when such an administrative remedy is provided, parties complaining must exhaust that remedy before resorting to the courts. Exhausting the remedy is not satisfied by a mere gesture; but the phrase means that there must be at least a fair attempt to have a hearing and to introduce one's evidence.

Nor is there any showing that a request for a hearing would have been futile or that a hearing would have been useless.

Counsel for the railroad companies in their brief make an admission which indicates a contrary conclusion. They admit that owing to complaints, the assessment of benefits to town lots was very materially increased by the board of assessors in 1930. It also appears that the assessment of benefits against telephone, telegraph, and power lines was materially increased in 1930.

After careful consideration, we reach the conclusion that there was no exhaustion of administrative remedy by the railroad companies as to the assessments of benefits to their properties, either for the year 1929 or the year 1930.

We think, therefore, that the trial court erred in entertaining the present suits.

The decree is reversed and the causes remanded with instructions to dismiss the several bills.